# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA
## GREENSBORO DIVISION
### Civil Case No. 1:24-cv-107

| | |
|---|---|
| SASSER COMPANIES, LLC, | |
| Plaintiff, | **COMPLAINT** |
| v. | |
| DAVID C. DUTA, | |
| Defendant. | |

Plaintiff Sasser Companies, LLC ("Plaintiff" or "Sasser") by and through its undersigned counsel, and complaining of Sasser's former Senior Vice President – West, Defendant David C. Duta ("Defendant" or "Duta") alleges:

## <u>INTRODUCTION</u>

1.     Sasser brings this action to recover damages caused by the dishonesty and material misrepresentations of Defendant. On numerous occasions, Defendant misrepresented how many hours he had worked and defrauded Sasser by receiving compensation and other benefits for work that Defendant did not perform. For example, on at least one occasion, Defendant told Sasser that he worked a full eight-hour day on the same day that his company truck was parked at Disneyland.

2.     After Sasser discovered Defendant's dishonesty and material misrepresentations, Sasser terminated his employment for cause pursuant to the employment agreement between Defendant and Sasser, which stated that Sasser

could terminate Defendant if he engaged in any acts of "fraud, embezzlement, or material dishonesty which is intended to result in personal enrichment of [Defendant] in connection with [Defendant's] engagement with Sasser Companies, LLC."

## PARTIES

3.     Sasser is a North Carolina limited liability company that maintains its principal place of business in Whitsett, North Carolina. Although Sasser has regional offices in Texas and California, Sasser was founded in North Carolina, the North Carolina office is the headquarters for the company, and Sasser's back office and administrative support (*e.g.*, human resources, IT, payroll, accounting, etc.) is based in North Carolina.

4.     For the purpose of diversity jurisdiction, Sasser is a citizen of North Carolina, as all three of Sasser's members are North Carolina citizens. Two members of Sasser are North Carolina corporations with their principal places of business in North Carolina, and the third member is a limited liability company whose members are North Carolina citizens.

5.     Upon information and belief, Defendant lives, resides, and is domiciled in California.

## JURISDICTION AND VENUE

6.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between Sasser and Defendant, and the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

2

7.     This Court has personal jurisdiction over Defendant as he was the Senior Vice President of a North Carolina limited liability company with its principal place of business in North Carolina.  Defendant executed several contracts with Sasser and also had numerous and purposeful contacts with North Carolina including, without limitation, the following:

    a.    In 2021, Defendant traveled to North Carolina to discuss and negotiate his original employment relationship with Sasser, and he traveled to North Carolina at least one other time in 2023 for Sasser business and to discuss a new employment agreement;

    b.    Defendant reported to a Sasser employee located in North Carolina and he regularly communicated with North Carolina employees, which typically meant initiating multiple communications per day to employees located in North Carolina via email, text message, and telephone calls;

    c.    Defendant regularly attended virtual meetings that were led and attended by North Carolina employees, including a weekly jobs meeting, a bi-weekly growth meeting, a bi-weekly state-of-locations meeting, regular safety and "best practices" meetings, and impromptu virtual meetings with Sasser's North Carolina leadership team;

d.    Sasser paid Defendant from a North Carolina bank account and Defendant's company-issued credit card was paid from a North Carolina bank account; and

e.    Defendant submitted timecards, reports, receipts, and requests for reimbursement to Sasser employees in North Carolina.

8.    The injury and damages to Sasser occurred in North Carolina.

9.    Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) and § 1391(b)(3).

## FACTUAL ALLEGATIONS

### A.    Defendant Meets with Sasser in North Carolina and Sasser Hires Defendant as a Senior Vice President.

10.    Before joining Sasser in May 2021, Defendant met with Sasser leadership in North Carolina to discuss Defendant potentially working for Sasser.

11.    Defendant, of his own volition, insisted on traveling to North Carolina to meet with Sasser's leadership and discuss a potential long-term employment relationship with Sasser before Defendant signed an offer letter.

12.    In May 2021, Sasser hired Defendant as its "Senior Vice President – West" with a starting salary of $210,000 per year.

13.    On or about May 17, 2021, Defendant signed an offer letter from Sasser and began working for the company (the "Offer Letter").[1] The Offer Letter was on Sasser letterhead and conspicuously identified Sasser's North Carolina address. The

---

[1] Attached hereto as **Exhibit 1** and incorporated by reference in this Complaint is a true and correct copy of the Offer Letter.

Offer Letter also included an indemnification provision that the parties agreed would be governed by North Carolina law.

14. The Offer Letter informed Defendant that he would report to Miguel Figueroa, a Sasser employee in North Carolina, and instructed Defendant to confirm his acceptance of Sasser's offer of employment by emailing a signed version of the offer letter to Mr. Figueroa in North Carolina.

15. On July 2, 2021, Defendant signed a "Sasser Companies, LLC Cardholder Agreement" (the "Cardholder Agreement").[2] In the Cardholder Agreement, Defendant agreed to comply with the terms and conditions of the Cardholder Agreement, including the credit card policy. Among other things, the Cardholder Agreement and the credit card policy notified Defendant that improper use of his Sasser credit card could result in disciplinary action and personal liability for personal purchases. The Cardholder Agreement also (i) required Defendant to provide receipts to Sasser's accounting department in North Carolina, (ii) limited the use of the company credit card to "business-related expenses" and stated that "any items not budgeted or approved by your manager must be authorized by the Chief Financial Officer," and (iii) required Defendant to immediately reimburse Sasser for any personal purchases on the company credit card. *See* Ex. 2, Cardholder Agreement at pp. 1-2.

---

[2] Attached hereto as **Exhibit 2** and incorporated by reference in this Complaint is a true and correct copy of the Cardholder Agreement.

16.     At the end of the Cardholder Agreement, Defendant agreed that Sasser "shall be entitled to pursue legal action, if required, to recover the cost of such purchases, together with costs of collection and reasonable attorney fees." *Id.* at p.2.

17.     Like the Offer Letter, the Cardholder Agreement is on Sasser letterhead and conspicuously lists Sasser's business address in North Carolina.

**B.      Defendant Executes a New Employment Agreement with Sasser.**

18.     On January 5, 2023, Defendant and Figueroa met to discuss several topics, including changes to his employment relationship. In a January 5, 2023, email to Figueroa to "recap" the discussion, Defendant noted that he was "[l]ikely coming to NC with Jerry to aid in speed and clarity of discussion." Defendant later traveled to North Carolina to meet with the Sasser team in late January 2023.

19.     On March 16, 2023, Mr. Figueroa informed Defendant that the Sasser team had "discussed your wife working in CA and decided to [sic] let's hold off."

20.     Nonetheless, on March 21, 2023, Defendant ignored his supervisor's directive and allowed his wife to work in Sasser's office. Upon information and belief, Defendant had planned for her to work at least one additional day in the office on March 23, 2023.

21.     Upon information and belief, Defendant granted his wife access to Sasser's computer system and confidential files and allowed her to use his company credit card to pay company expenses. Sasser did not authorize—and would not, if it had known, have authorized—Mrs. Duta to access Sasser's computer systems, confidential files, or company credit card.

6

22.     Defendant also promised his wife that she would be paid for her time. Defendant was not authorized to unilaterally approve payment to his wife or anyone else.

23.     In May 2023, Defendant informed Sasser leadership that he was seeking medical attention for an illness. Among other things, Defendant told Sasser leadership that "[d]epending on my productivity, I will either put entire days as sick and pto time or partial days as I get better and better." Sasser leadership wished him well, agreed with his plan, and encouraged Defendant to consult with Sasser leadership if the California office needed any additional support.

24.     On July 3, 2023, Defendant informed Sasser leadership that he had been diagnosed with an illness[3] and would be receiving additional treatments. Defendant agreed that he would use his paid time off ("PTO") if there were days or parts of days that he could not work.

25.     On or about July 17, 2023, Defendant and Sasser entered into a new employment agreement (the "Employment Agreement").[4] Like the Offer Letter, the Employment Agreement was on Sasser letterhead and conspicuously listed Sasser's business address in North Carolina. The Employment Agreement superseded and replaced the Offer Letter as the operative employment agreement for Defendant. *See* Ex. 3, Employment Agreement at p.3.

_____

[3] Out of respect for Defendant's privacy, Sasser has only included the limited necessary details about Defendant's health.

[4] Attached hereto as **Exhibit 3** and incorporated by reference in this Complaint is a true and correct copy of the Employment Agreement. Although the Employment Agreement includes the date of July 14, 2023, at the top of the document, Defendant signed the Employment Agreement on July 17, 2023.

7

26.     Defendant's title remained Senior Vice President – West and he continued to report to Mr. Figueroa, but his salary increased to $240,000 per year. *Id.* at p.1.

27.     The Employment Agreement contemplated the concept of termination of employment for cause, which modified Sasser's obligations to Defendant upon his separation from Sasser. In that context, the Employment Agreement included the following definition of "cause":

> i. the commission of an act of fraud, embezzlement, or material dishonesty which is intended to result in personal enrichment of Employee in connection with Employee's engagement with Sasser Companies, LLC;
>
> ii. Employee's conviction of, or plea of nolo contendere, to a crime constituting a felony (other than traffic-related offenses);
>
> iii. Employee's willful misconduct that is materially injurious to Sasser Companies, LLC.

*Id.* at p.2.

28.     The Employment Agreement further stated that "[i]f Employee's engagement is terminated for Cause pursuant to the previous sections, Sasser Companies, LLC shall only compensate Employee any unpaid salary for work completed up to the date of the termination and/or criminal offense." *Id.* at p.3.

29.     The Employment Agreement also included the following provision:

> Upon termination for death, retirement, amicable separation, sale, merger, or termination without cause, Sasser Companies, LLC will provide the Employee with 3X of the Employee's pro-rata share of the net profit for the employee's managed P&Ls for the previous 12 months, including the month when the separation occurred (as

8

> determined by the calculation methodology as outlined in
> the Employee's Exhibit A agreement) . . . .

*Id.*

30.    On July 26, 2023, Defendant filed a claim for disability insurance with

the California Employment Development Department and represented that his last

day worked with Sasser was May 12, 2023. Yet, Defendant continued to book and be

paid for forty (40) hours of work per week with Sasser and continued to accrue PTO.

Sasser was unaware at the time that Defendant filed a claim for disability insurance.

31.    On August 25, 2023, Mr. Summers contacted Defendant's supervisor,

Mr. Figueroa, to ask about Defendant's plan as his PTO entries were increasing

dramatically. Defendant responded that:

> *"I enjoy working when I feel good; it helps my mind, passes
> the time in a healthy way, and any help I can give the team
> always goes a long way. That said, I am not working at
> 100% and have been putting in PTO days throughout the
> process. I am going to put some extra PTO in this week, even
> though I worked, to make up for some other days in the past
> that I thought would be 50% days and I ended up sick the
> whole day. In talking with Miguel, he mentioned the
> possibility of short-term disability (DI) combined with
> working part time. I am considering this option, and would
> like some more information please. From my understanding
> it would only pay $1,620 per a week. Due to the amount of
> PTO I have accrued, I'm not sure DI is worth the
> hassle/paperwork. I have gone this long working and using
> PTO, but want to consider every option as this journey still
> has some road in front of it.*

32.    Defendant sent this email almost a full month after he applied for

disability insurance and reported to the State of California that he last worked for

Sasser on May 12, 2023.

33.    On September 1, 2023, Wes Hershelman—Sasser's Director of Finance—met with Defendant and Sasser's Health Benefits Representative to discuss Defendant's options since Defendant had not elected short-term disability coverage. Even though the three met to discuss Defendant's options and benefits, Defendant did not inform Mr. Hershelman that he had already filed a claim for disability insurance.

34.    On September 5, 2023, Ryan Justice, a Sasser employee located in North Carolina, contacted Defendant because Defendant had only entered twenty-four (24) hours for the prior work week and asked whether Defendant intended to use PTO to get to forty (40) hours for the week. Defendant first told Mr. Justice that he "[w]as thinking of part time disability but getting more information today" and later confirmed that he would "be filing part time disability" as it was "[b]etter to not use any more pto."

35.    Later that night, Defendant followed up again with the following email to Mr. Justice and Mr. Hershelman:

> *Filed all part time disability. I'll know in next two weeks if accepted and benefit range etc.*
> *In the meantime will only fill in 2 or 3 days worked a week and no PTO. Wes, perhaps at the end of our CA meeting tomorrow we can discuss this.*

36.    Mr. Justice responded on September 6, 2023, and informed Defendant that his check for the prior pay period would be "prorated at an amount to reflect the 64 hours that [Defendant] reported in [Sasser's timekeeping software]."

10

37. On September 12, 2023, Defendant told Mr. Justice that he had submitted his time for the prior week and "[n]o pto as I am trying to see how SDI benefits will work."

38. On September 13, 2023, Sasser's two partners—Houston Summers and Sebastian Williams—met with Defendant via telephone and Microsoft Teams to discuss his health and his role at the company. Mr. Summers and Mr. Williams clearly informed Defendant that he needed to use his PTO or explore short-term disability if he was not able to work. Sasser encouraged Defendant, however, to focus on improving his health and moving the office forward when he was able to work. Mr. Summers and Mr. Williams also encouraged Defendant to contact Mr. Hershelman and the benefits team to ask questions.

39. Defendant emailed Hershelman the same day and stated the following:

> *"Hi Wes, In talking with Houston he suggested I follow up with you as there may have been some confusion. I am continuing to move forward with filing for partial/part time disability . . . I am also waiting to hear back if the case was approved and what the parameters will be. If the parameters work, then I will continue with the process, if they do not, then I will reconsider and weight my other option of using up my PTO. Please feel free to call me or email with any clarifications needed."*

40. Mr. Hershelman thanked Defendant for the information and asked him to keep Sasser "in the loop."

41. Around the same time, Sasser received a Notice to Employer of Disability Insurance Claim Filed from the California Employment Development Department. This notice alerted Sasser for the first time that Defendant had applied

11

for disability insurance in July 2023, which was inconsistent with Defendant's representations to Sasser.

42. The notice also informed Sasser that Defendant had misreported to the State of California that his "Last Reported Day Worked" was May 12, 2023.

43. In its September 14, 2023, response to the notice, Sasser stated that Defendant was a current employee who worked forty (40) hours per week at $115.38 per hour. Sasser also corrected Defendant's misrepresentation and informed the State of California that Defendant was still employed by Sasser.

### C. Sasser Terminates Defendant's Employment for Cause After Discovering He Had Defrauded and Lied to Sasser.

44. At all times, Sasser and Defendant understood that Defendant should and would either use PTO or sick time if he was unable to work full-time, or submit hours that accurately reflected his work in any given pay period.

45. Beginning no later than October 2023, Defendant's work for Sasser decreased dramatically and he began reporting fewer than forty (40) hours per week. The Sasser leadership team noticed a corresponding drop in productivity from Sasser's satellite office in California, and the North Carolina team began receiving complaints about Defendant from California-based staff members.

46. Mr. Figueroa met with Defendant to remind him that he needed to document any leads he created on Sasser's internal system and that Defendant's primary responsibility was making introductions for business development. When Defendant suggested to Mr. Figueroa that he did not want to meet people in person, Mr. Figueroa suggested that Defendant reach out via email or text message.

12

47.    Starting in November 2023, Defendant reported forty (40) hours of work per week without reporting any PTO. But in reality, Defendant continued to work far fewer than forty (40) hours per week while being fully compensated as a direct result of and in reliance on Defendant's misrepresentations to Sasser.

48.    Even though Defendant reported and was paid for working forty (40) hours per week in November, he sent only thirty-six (36) text messages and made only thirty (30) telephone calls the entire month of November.

49.    For comparison, Defendant sent three hundred and forty-eight (348) text messages and made eighty-six (86) telephone calls in August 2023.

50.    In the first two weeks of December 2023, Defendant sent only ten (10) emails (*i.e.* he averaged a single email per business day) and scheduled no external meetings and few internal meetings. Yet, Defendant reported to Sasser that he was working forty (40) hours per week. Sasser relied on Defendant's misrepresentations and paid him for forty (40) hours of work per week.

51.    Sasser also confirmed that, on at least one day, Defendant reported working eight hours for Sasser while his company truck was located at Disneyland most of the day.

52.    On December 13, 2023, Defendant shared with Sasser that he had "originally filed for part time disability, and the claim was accepted and then later rejected." According to Defendant, "[t]hey said [he] need[ed] to meet in person with a case officer and jump through a bunch more hoops" and Defendant was "[f]inally

feeling well enough to tackle that, but not sure if worth the trouble." Therefore, Defendant was "contemplating just using my PTO as [he had] so much of it."

53. On December 19, 2023, Sasser terminated Defendant's employment with the company for cause as defined in the Employment Agreement. As Sasser stated in the termination letter it sent to Defendant (the "Termination Letter")[5], Sasser terminated Defendant's employment as he had committed "acts of material dishonesty which were intended to result in [Defendant's] personal enrichment in connection with [his] employment with Sasser[]." Ex. 4, Termination Letter at p.1. The Termination Letter further stated that:

> Such acts of material dishonesty include, among others: (1) falsifying timecards by reporting you worked, and thus were paid for by Sasser, more hours than you admit you actually worked for each of the week of November 27, 2023, through December 1, 2023, and the week of December 4, 2023, through December 8, 2023, and (2) falsifying your timecard on December 4, 2023, by reporting you worked eight (8) hours, and were thus paid for eight (8) hours of working time by Sasser, when evidence obtained by Sasser shows you could not have worked eight (8) hours as you were engaged in activities at sites not work- or healthcare-related.

54. On his last day, Sasser paid Defendant $28,947.70, which included $21,563.08 for accrued but unused PTO.

---

[5] Attached hereto as **Exhibit 4** and incorporated by reference in this Complaint is a true and correct copy of the Termination Letter.

**D.      Defendant Retains Litigation Counsel and Threatens Sasser With Litigation Related to Defendant's Employment and Termination.**

55.      On January 23, 2024, Sasser received a letter from Stephen Kimball, an attorney with the employment law firm of Sessions Kimball (the "Litigation Letter").[6] In the Litigation Letter, Mr. Kimball stated that he represented Defendant "regarding his employment claims against [Sasser]" and his law firm was "currently investigating our client's claims regarding Disability Discrimination, Failure to Accommodate, Denial of CFRA Rights, and other labor and employment claims." Ex. 5, Litigation Letter at p.1.

56.      The letter purports to "put [Sasser] on notice to preserve evidence" and demands an expansive list of "[d]ocuments at issue in this case includ[ing] communications between [Defendant] and any person who supervised our client at the company and/or anyone who witnessed the facts and circumstances regarding his employment with and termination from the company." *Id.*

57.      Rather than explain the merits of Defendant's forthcoming (and meritless) claims against Sasser, the nine-page letter threatens Sasser with sanctions related to nonexistent "[s]poliation of evidence" and foreshadows the law firm's litigation strategy by stating the firm "will be diligently searching for any deletion or other impropriety in your computer systems or in the documents." *Id.*

---

[6] Attached hereto as **Exhibit 5** and incorporated by reference in this Complaint is a true and correct copy of the Litigation Letter.

15

58. The Litigation Letter also confirms that Defendant's attorneys are preparing for litigation: "Most defendants appreciate a reasonable inquiry by a plaintiff's attorney regarding the claims before filing a lawsuit." *Id.* at p.8.[7]

## CLAIMS FOR RELIEF

### COUNT ONE
### Breach of Employment Agreement and the Implied Covenant of Good Faith and Fair Dealing

59. Sasser hereby realleges the allegations of Paragraphs 1 through 58 as if fully set forth herein.

60. The Employment Agreement is a valid and enforceable contract between Sasser and Defendant.

61. At all times, Sasser performed its obligations under the Employment Agreement and performed all conditions that Sasser was required to perform under the Employment Agreement.

62. In addition to the express terms of the contract, the Employment Agreement includes an implied covenant of good faith and fair dealing.

63. Defendant breached the Employment Agreement and the implied duty of good faith and fair dealing by falsifying his time records and misrepresenting when he worked and the services he performed for Sasser.

64. Defendant also breached his Employment Agreement and the implied duty of good faith and fair dealing by (i) allowing his wife to work for Sasser, access

---

[7] During his termination meeting, Defendant also made clear to Sasser that he intended to sue the company after his termination.

16

Sasser's computer system, and use Defendant's Sasser-issued credit card after Sasser specifically told Defendant that his wife was not authorized to work for the company; and (ii) using his Sasser credit card to make unauthorized purchases.

65. As a result of Defendant's breaches of the Employment Agreement and the implied duty of good faith and fair dealing, Sasser has suffered damages that flow directly from and are the natural and probable consequences of Defendant's breaches. The damages to Sasser were foreseeable and within the contemplation of the parties when they entered into the Employment Agreement.

## COUNT TWO
### Breach of Cardholder Agreement

66. Sasser hereby realleges the allegations of Paragraphs 1 through 65 as if fully set forth herein.

67. The Cardholder Agreement is a valid and enforceable agreement that is supported by adequate consideration.

68. At all times, Sasser performed all of its obligations and conditions that Sasser was required to perform under the Cardholder Agreement.

69. In the Cardholder Agreement, Defendant agreed that:

   a. "[I]mproper use of [the company credit card] may result in disciplinary action as well as personal liability for any improper purchases," Ex. 2, Cardholder Agreement at p.2;

   b. He would "comply with the terms and conditions of this agreement and the Credit Card Policies for [Sasser]," *id.*;

17

c.    He "accept[ed] responsibility and accountability for the protection and proper use of the card," *id.*;

d.    The card was "not to be used for personal purchases and if personal purchases are made [Sasser] will be immediately reimbursed," *id.*;

e.    He would "provide a receipt for every purchase except for authorized monthly charges that are preapproved by Accounting," *id.*;

f.    Sasser would be "entitled for reimbursement" if Defendant "used the card repeatedly for personal purchases, or for purchases for any other entity, or if [Defendant] fail[ed] to provide a receipt substantiating a legitimate business within 48 hours of the transaction," *id.*; and

g.    Sasser "shall be entitled to pursue legal action, if required, to recover the cost of such purchases, together with costs of collection and reasonable attorney fees," *id.*

70.    The Employer Credit Card Policy and Agreement referenced in the Cardholder Agreement further states, among other things, that:

a.    Employees shall use their corporate credit cards to charge "business-related expenses" and "[e]xpenses must be for approved budget items only," Ex. 2, Cardholder Agreement at p.1;

18

b.   "Any items not budgeted or approved by your manager must be authorized by the Chief Financial Officer (CFO)," *id.*;

c.   "Personal purchases of any type must be paid back to the company immediately and the receipt for the purchase turned into Accounts Payable Department," *id.*;

d.   "The employee is responsible for all charges made to the card" and "[t]he employee will be held liable for any unauthorized items appearing on the credit card statement," *id.*;

e.   "The employee must obtain a receipt for the purchase and include a brief description of the business purpose or the account cost code and job number on the receipt," *id.*;

f.   "The receipt is to be submitted to the Account Payable Department within 48 hours of card use," *id.*; and

g.   "Any items that do not have a receipt will be the personal responsibility of the cardholder," *id.*

71.   Defendant breached the Cardholder Agreement by using his company-issued credit card for, among other things, an unauthorized purchase of a $1,600 luxury watch in 2022. Defendant further breached the Cardholder Agreement by granting his wife access to his company credit card and allowing her to make payments on behalf of Sasser without authorization and after Sasser specifically instructed Defendant that his wife was not authorized to work for Sasser. Lastly, upon information and belief, Defendant breached the Cardholder Agreement by

19

failing to timely and properly request necessary approvals and/or submit receipts and reimbursement requests.

72.     As a result of Defendant's breaches of the Cardholder Agreement, Sasser has suffered damages that flow directly from and are the natural and probable consequences of Defendant's breaches. The damages to Sasser were foreseeable and within the contemplation of the parties when they entered into the Cardholder Agreement.

**COUNT THREE**
**Unjust Enrichment**
**(In The Alternative)**

73.     Sasser hereby realleges the allegations of Paragraphs 1 through 72 as if fully set forth herein.

74.     Sasser pleads this claim for unjust enrichment as an alternative to its breach of contract claims in Counts One and Two.

75.     Sasser conferred a measurable benefit on Defendant by paying him compensation, including benefits, to work for Sasser honestly and faithfully.

76.     Defendant knowingly and voluntarily accepted the compensation and other benefits paid to him by Sasser to work on behalf of the company.

77.     Sasser did not gratuitously provide compensation and other benefits to Defendant; instead, Sasser provided compensation and benefits to Defendant with the expectation that he would perform services on behalf of the company and be honest with Sasser about the work he performed.

20

78. Sasser also allowed Defendant to make certain purchases on behalf of the company.

79. The circumstances of Defendant's employment by Sasser and the relationship between the parties show that the compensation and benefits that Sasser conferred on Defendant give rise to a legal or equitable obligation on the part of Defendant to account for the benefits he received.

80. Thus, it would be unjust to allow Defendant to retain the compensation and other benefits he received from Sasser for work that Defendant did not perform for the company and that Defendant received by misleading Sasser about the work he was performing.

**<u>COUNT FOUR</u>**
**Civil Liability Under N.C. Gen. Stat. § 1-538.2**
**N.C. Gen. Stat. §§ 14-74; 14-90; 14-100**

81. Sasser hereby realleges the allegations of Paragraphs 1 through 80 as if fully set forth herein.

82. N.C. Gen. Stat. § 1-538.2 provides a civil remedy for theft by employees (N.C. Gen. Stat. § 14-74) and obtaining property by false pretenses (N.C. Gen. Stat. § 14-100).

83. As a Senior Vice President, Sasser entrusted Defendant with a company credit card, access to other funds for Defendant to use for company business, use of company-issued vehicles for business purposes, and to record the time he worked for the company accurately and honestly.

21

84. Defendant intentionally and fraudulently obtained Sasser compensation, benefits, and other funds by false pretenses. Specifically, he intentionally and fraudulently misrepresented that he was working forty (40) hours per week for Sasser when he was working far fewer than forty (40) hours. Sasser actually and reasonably relied on Defendant's misrepresentations and compensated him for forty (40) hours of work per week in addition to other benefits such as the accrual of PTO.

85. Sasser did not authorize or allow Defendant to receive compensation for forty hours (40) if he was working less than full-time.

86. In addition to the compensation and other funds paid by Sasser and the value of the goods taken from Sasser, Sasser has incurred attorneys' fees and other consequential damages that are recoverable under N.C. Gen. Stat. § 1-538.2, such as salaries and compensation paid to Sasser employees to investigate Defendant's theft, misrepresentations, and misconduct.

## COUNT FIVE
## Fraud and Intentional Misrepresentation

87. Sasser hereby realleges the allegations of Paragraphs 1 through 86 as if fully set forth herein.

88. Defendant misrepresented the time he worked for Sasser and/or concealed the material fact that he was not working on certain days. Defendant's misrepresentations included, but are not limited to, misrepresenting that he worked forty (40) hours per week all four weeks of November and the first two weeks of December. Defendant had a duty to report the time he worked for the company

22

honestly and faithfully, and to disclose any time or days that he did not work for Sasser.

89.     Defendant's misrepresentations were reasonably calculated to deceive Sasser as Defendant knew the misrepresentations were false and knew that he had a duty to disclose days that he did not work for Sasser.

90.     Defendant intended his misrepresentations to deceive Sasser and Sasser was in fact deceived by Defendant's misrepresentations and concealments.

91.     Sasser's reliance on the representations of its former Senior Vice President was reasonable because a reasonable person or employer, under the same or similar circumstances, in the exercise of ordinary care, would have relied on the false representations of Defendant.

92.     Defendant's misrepresentations and concealments proximately caused damage to Sasser.

## COUNT SIX
## Constructive Fraud

93.     Sasser hereby realleges the allegations of Paragraphs 1 through 92 as if fully set forth herein.

94.     As a Senior Vice President, Defendant had a relationship of trust and confidence with Sasser because Sasser placed special confidence in Defendant. In equity and good conscience, Defendant had a duty to act in good faith and with due regard for Sasser's interests.

95.     Defendant used his position of trust and confidence to obtain compensation and benefits from Sasser and to obtain access to a company-issued

credit card. Defendant then misused his position of trust and confidence to the detriment of Sasser and for Defendant's own benefit by, among other things, misrepresenting the number of hours he worked in November and December 2023 and making at least one unauthorized purchase with his company credit card.

96. Defendant's constructive fraud proximately caused damage to Sasser.

**COUNT SEVEN**
**Declaratory Judgment**
**28 U.S.C. § 2201; N.C. Gen. Stat. § 1-253**

97. Sasser hereby realleges the allegations of Paragraphs 1 through 96 as if fully set forth herein.

98. An actual and justiciable controversy has arisen and exists between Sasser and Defendant with respect to the termination of Defendant's employment with Sasser and the parties' rights and liabilities under the Employment Agreement.

99. The parties disagree about whether Sasser had the right to terminate Defendant for cause under the Employment Agreement.

100. The parties disagree about whether Sasser owes Defendant any additional monies under the Employment Agreement.

101. The parties disagree about whether Sasser is liable to Defendant under any state or federal labor and employment laws.

102. Defendant has retained counsel and threatened litigation against Sasser arising out of his employment by Sasser, including the termination of his employment with Sasser.

24

103. A declaratory judgment by this Court will serve a useful purpose in clarifying and settling the legal relations between Defendant and Sasser and will terminate and afford relief from the uncertainty, insecurity, and controversy between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sasser Companies, LLC respectfully prays for the following relief:

1. For a money judgment against Defendant for an amount to be proven at trial;

2. For an award of consequential damages, attorneys' fees, and other relief provided for in N.C. Gen. Stat. § 1-538.2;

3. For interest as provided by law;

4. For an award of the costs of this action;

5. For punitive damages;

6. That the Court declare the rights of the parties with respect to Employment Agreement and declare that Plaintiff owes Defendant nothing under the Employment Agreement;

7. That the Court declare the rights of the parties under federal and state law governing any claim by Defendant arising from his employment by Sasser or the termination of his employment with Sasser, and declare that Plaintiff is not liable to Defendant under any such statute or law; and

8.     For all other and further relief as the Court may deem just and

proper.

Dated:  February 12, 2024

/s/ Sean C. Wagner

Sean C. Wagner, (N.C. State Bar No. 50233)
Jonathon D. Townsend, (N.C. State Bar No. 51751)
WAGNER HICKS PLLC
831 E. Morehead Street, Suite 860
Charlotte, North Carolina 28202
Telephone: (704) 705-7358
sean.wagner@wagnerhicks.law
jonathon.townsend@wagnerhicks.law

*ATTORNEYS FOR PLAINTIFF SASSER COMPANIES, LLC*